# EXHIBIT B

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

MIGUEL GALINDEZ, CIVIL PROCEEDINGS

Plaintiff, C.A. NO.:04C-05-073 JRJ

vs.

NARRAGANSETT HOUSING ASSOCIATES, L.P. t/a LEXINGTON GREEN APARTMENTS, PROPERTY ADVISORY GROUP, INC. and LOCKS & PROTECTION DEVICES, INC.

Defendants.

BEFORE: THE HONORABLE JAN R. JURDEN, J.

APPEARANCES:

RICHARD A. ZAPPA, ESQUIRE
YOUNG, CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899-0391
(302) 571-0626

SEAN A. DOLAN, ESQUIRE
MARSHALL, DEMEHEY, WARNER
COLEMAN & GOGGIN
1220 N. Market Street, 5th Floor
Wilmington, DE 19899
(302) 552-4307

DEFENDANT'S MOTION FOR A NEW TRIAL
May 10, 2006

Jean Preston, CSR
Official Court Reporter
500 N. King Street Suite 2609
Wilmingtron, DE. 19801-3725

that, they might tend to find him much more credible than they found her; that's all I'm saying.

MR. DOLAN: I appreciate that.

But Your Honor, keep in mind before we leave the topic of the survey that the subject came up, the survey came up less than three weeks before Mr. Galindez got hurt.

Now, if that survey was delivered nine months, six months, or something substantially longer, we might have a different situation here. But I don't think a two and a half week period of time, that during that time frame that we can reasonably expect that the failure to correct -- and keep in mind it's just not that one door.

The failure to correct this constitutes the I don't care attitude.

THE COURT: Well, isn't the jury allowed to consider the evidence that came in that the door problem still isn't fixed?

MR. DOLAN: Well, I guess, they are, but keep in mind that the plaintiff's expert who talked about that never specifically said, they never compared surveys and said this door was broken and still isn't fixed, this door was broken and still isn't fixed. What





he said was they continue to be maintenance problems, and we didn't deny that.

I mean the point that I was trying to make to the jury, I know that the Code still applies to Section 8 Housing. We can't dispute that. But nevertheless, the defendant's conduct still has to be measured by a standard of reasonableness. And our view is that one of the things the jury needed to be able to consider was, this, this is probably not like your neighborhood where if you have a house that needs attention all of the time it is really going, or a door that needs attention, is probably going to stand out.

This is not that type of place, and I'm not trying to say that --

THE COURT: No, it's a place where poor peo| live, right, is that what you're saying, because if this in Westover Hills the door would have been fixed within max, three hours. But because it's Section 8 it goes on because it just keeps getting broken?

MR. DOLAN: No, well I don't mean to sound, need to be careful how I say this because I'm not trying to sound elitest or say the people who live there are not as good as the people who live in Westover Hills.





I'm not saying that.

THE COURT: You're saying the standard of reasonableness differs on the location.

MR. DOLAN: Well, I'm saying that it needs to be taken into consideration when you consider whether someone exhibits an I don't care attitude.

In other words--

THE COURT: Well, does it need to be taken into consideration on the standard of negligence?

MR. DOLAN: Well, probably not; probably not. I think that if you could, I would agree that the jury could probably have reasonably concluded that it may have been negligent not to have had that door, or even a formalized plan as Your Honor alluded to a few minutes ago, to fix all of the doors in two and a half weeks.

I suppose the jury could conclude that.

But to make the leap from that conclusion and say that the defendant exhibited an I don't care attitude with specific reference to a particular injury, a foreseeable injury to somebody like what happened here, it just couldn't be done I don't think reasonably by the jury.

Your Honor, that basically sums up our





position.

We alluded to the question, in our view this is a case where the jury obviously like either Ms. Rimel or Mr. Baird or both of them.

But our view is that what the jury did with the testimony in this case essentially tainted the compensatory damage award; that the punitive damage instruction should not have been given to them in the first place and as a result of it having been done the jury was allowed to consider things that they really shouldn't have and that their thought process was tainted.

THE COURT: If the jury found negligence, and again my hypothetical assumes punitives were not introduced into the case by my jury charge but by the evidence, if the jury found negligence, you're asking for remittitur, what remittitur? What remittitur do you think is reasonable in your view?

MR. DOLAN: I haven't had enough, I don't know if, am I allowed to suggest a number?

THE COURT: I'm asking you; we're not in front of a jury so there's no prohibition.

MR. DOLAN: A million dollars; give him a

million dollars. That's what I would say.

THE COURT: Okay; thank you.

MR. DOLAN: If I can, just a couple points.

Well, I'll save that for rebuttal if I can have a few minutes.

Thank you.

THE COURT: Mr. Zappa.

MR. ZAPPA: Your Honor, Richard Zappa, for the plaintiff.

The standard the defendants must meet go have this Court grant a new trial is no different than if there were some evidentiary issue or some other alleged error during the course of the trial. But when it is based on the sufficiency of the evidence as it is here, judgment as a matter of law is only granted when there is no legally sufficient evidentiary basis for a reasonable jury to have found in this case that there was recklessness on the part of the defendant, which would give rise to why The Court would instruct a jury on punitive damages and why the jury would be permitted to award punitive damages in this case.

The Jardell decision I think is pretty dispositive on the standard.





Plaintiff does not have to prove intent or actual malice. It is not required, it is only required that the plaintiff show that the conduct be so unreasonable and so dangerous that the person either knows or should know that the harm will probably result.

This is the analysis in response to a number of different questions.

The first question of course is, was the condition of the door dangerous and in such a way as to make it foreseeable to the defendant that it could cause injury?

June Hollis seemed to think it was, the tenant; she called and complained about it. But we need to go no further than the testimony of Sue Rimel, and Your Honor, I did order the trial transcript. I sent over what portions had been completed to The Court.

THE COURT: I did get that; thank you.

MR. ZAPPA: But I'm not going to refer to all of the factual facts that were established by the trial testimony; but I'll refer to just a few if I can.

At page 191 and 192 of Ms. Rimel's testimony, these questions, and I guess I should go back and --

THE COURT: Does Mr. Dolan have a copy?





MR. DOLAN: No, I haven't got it.

THE COURT: Here, you can see the Court's. It's more important that you see it.

MR. ZAPPA: First question, "Is the condition of the door dangerous and in a manner which is foreseeably going to cause injury of the type Mr. Galindez sustained?"

This is sue Rimel's testimony testimony.

At page first of all, 182, 183.

My question, "If a tenant called and said, quote, I have a door slamming, there's no closure on it, end of quote, am I correctly summarizing the portion of your answer which was responsive, that you would call right away?" I think you said if it was slamming. Her answer "Uh-huh."

"Q Did I correctly understand your testimony?"

"A That's correct."

"Q And you would have done that because you know that that would have been a dangerous condition you would want to address?"

"A That's correct."

"Q And then you would expect that a work





order would be prepared and given to maintenance, they would go out, they would address the issue of the door closure, they would put a new one on, come back, fill out a work order, give it to you so that you would know that they had done their job; is that correct?"

"A Right."

Now, you've got to couple that with testimony at pages 191 and 192.

My question to her was very specifically.

"Q You did know that the free-swinging doors without closures were an unsafe condition that could cause injury such as Mr. Galindez suffered; isn't that correct?"

"A Yeah."

Then I asked her:

"Q You had knowledge that the condition could cause injury?"

"A Yeah."

"Q Somebody getting their hand slammed shut in the door; is that correct?"

"A Sure."

"Q and you would expect your maintenance staff to know that as well; is that correct?"

STATE OF DELAWARE)
NEW CASTLE COUNTY)

CERTIFICATE OF COURT REPORTER

I, Jean Preston, Official Court Reporter of the Superior Court, State of Delaware, do hereby certify that the foregoing is an accurate transcript of the proceedings had as reported by me in the Superior Court of the State of Delaware, in and for New Castle County, in the case herein stated, as the same remains of record in the Office of the Prothonotary at wilmington, Delaware, and that I am neither of counsel nor kin to any party or participant in said action, nor interested in the outcome thereof.

WITNESS my hand this 23rd day of May, 2006.

Jean Preston, CSR
Official Court Reporter

Jean Preston, CSR
Official Court Reporter
500 N. King Street Suite 2609
Wilmingtron, DE. 19801-3725