its misconduct...."[31] Plaintiff alleges PAG attempted to "cover up its misconduct" by: (1) claiming that Eric Campbell (of defendant Locks and Protection Devices, Inc.) installed the closer on the door which injured Mr. Galindez even though PAG could produce no specific documentation to substantiate the claim, Mr. Campbell expressly denied it, and an eyewitness (June Hollis) offered sworn testimony that the closer was broken on the day of the accident and for at least a year prior to Mr. Galindez' injury; (2) replacing the door closer on November 13, 2003 immediately after the accident to make it look like it was the closer installed by Eric Campbell that was not working properly when Mr. Galindez was injured; and (3) removing and disposing of the closer after plaintiff's claims were filed in Court so that the door closer could not be inspected and tested by plaintiff's liability expert or linked to PAG. In addition to the Campbell Survey, plaintiff cites to much other trial testimony and numerous exhibits in support of its reckless conduct claim. Just some examples are: (1) Eric Campbell's letters to Greg Jenner ("Jenner") dated October 29 and November 6, 2003, proving that PAG knew about the dangerous conditions described in the Campbell Survey as early as April of 2003, approximately seven months prior to Mr. Galindez' injury; (2) testimony from Julius Pereira and James Baird proving that the problem of broken door closers in the common area hallways at Lexington Green Apartments, as described in the

[31] Pl. Br. Opp'n, D.I. 67, at 9.

Campbell Survey, continued without any significant remediation up until the time of trial; (3) damaging testimony from Susanne Rimel ("Rimel"), discussed below, establishing the knowing breach of PAG's duty and the foreseeability of the manner and nature of plaintiff's injury and (4) testimony from June Hollis ("Hollis") that the door which injured Mr. Galindez was broken and left unrepaired for about one year prior to the accident even though she and other tenants had banded together with the help of a Community Legal Aid Lawyer and demanded that it be repaired; (5) testimony from Jenner about PAG's operations in Delaware and other states and about PAG's management responsibilities under its property management contract for Lexington Green Apartments; (6) testimony from Jenner and Rimel that the problems with the door and door closers, as described in the Campbell Survey, were never repaired by the on-site maintenance staff or by any outside contractors; and (7) testimony from Rimel that the Lexington Green and Liberty Terrace apartment complexes, which PAG wanted to purchase, produced 2.3 million dollars in annual rental revenues, mostly guaranteed by the federal government.

The Court remembers this trial well. One of the reasons the trial is so memorable is the testimony of Susan Rimel, the community manager of Lexington Green Apartments and an employee of PAG. On direct examination, when asked

about how maintenance issues are handled at the Lexington Green apartment complex, replied:

> If somebody called and told us the closer was completely broke off and the door was slamming, I would send somebody over there, but if they called and say it's hanging open – the biggest problem in the hallways of Lexington Green is vandalism. They are always breaking the closers off because they don't want the doors shut, "they" being the people hanging in the hallways that are independent pharmacists, I guess is the word. They like to sell their own brands, and children doing vandalism, they're always breaking the door closers, the glass. We changed from glass to plexiglass because there was so much of the glass broken out of the doors, and the handles, and that's because they tied the door open so that – and that's one of the reasons Arbor Management entered into a contract with Eric Campbell to secure the doors.
>
> Those – those slide plates were broke within three months of being put on. None of them worked. The residents broke them. They don't want them there, because when the police are chasing them, they go straight through the buildings, and that's why we then called Eric back to say, "Eric, okay, these didn't work. Can you get us key locks. We need to get these door locked," and Mr. Campbell come out.[32]

Not only did Rimel admit that she did not hire anyone or order maintenance to fix the broken door closer identified in the Campbell Survey, she admitted that she knew (before the plaintiff was injured) a door without a properly functioning closer is an unsafe condition that could cause an injury like the one suffered by

[32] Trial Tr. Rimel, D.I. 71, at 180-181.

plaintiff.[33] Unfortunately, the transcript does not (and cannot) capture Rimel's tone and demeanor while delivering her diatribe. But the Court remembers this particular testimony and its impact vividly. The "they" Rimel was referring to, with palpable disgust and indifference, the residents of the Lexington Green apartment complex (300 of them children), were portrayed through Rimel's tone, demeanor, and words as hoodlums, vandals, drug dealers, and fugitives. It was clear after Rimel testified that PAG did not fix the broken door because "*they*" would just break it again, and that PAG considered it a waste of its time and money to fix a door "these people" would just break again when running away from the police.[34] The moment Rimel dropped this bomb in the courtroom, the defense was doomed. To say Rimel's testimony was harmful to the defense is an understatement. Overall, she conveyed a callous and indifferent attitude toward the safety of the residents and others on the premises, engaged in stereotyping which could have been interpreted as racism, showed zero understanding or compassion for economically disadvantaged or disenfranchised people and children, and suggested that it would be a waste of time and money to fix dangerous conditions because the vandals who created those conditions would just do so again. Rimel's testimony was the proverbial "icing on the cake." With this,

---

[33] Trial Tr. Rimel, D.I. 71, at 183-184.
[34] *Id.* at 180-181.

plaintiff discharged his burden with regard to his reckless conduct claim, and then some.

In light of all the evidence, plaintiff was entitled to a punitive damage instruction and the Court gave it. As the Court expected, based on the evidence, the jury assessed punitives against PAG. The jury concluded that a large punitive damages award was warranted and reasonable given the financial condition of PAG, and was necessary in order to deter PAG from engaging in the same or similar conduct at Lexington Green Apartments. Given the evidence, the Court will not vitiate this punitive damage award, nor will it reduce it. The ratio of punitive damages to compensatory damages is 3.3. In light of all the evidence, the Court's conscience is not shocked by this ratio or the amount of the punitive damages award.[35]

In support of their argument that the three million dollar compensatory damages award is excessive, defendants point out that: plaintiff sustained injury to only two fingers; his last medical treatment for that injury occurred well over a year before trial; he did not assert a claim for future medical expenses; he was still able to work as a standard cable installer; and his special damages totaled less than 17% of the jury's total compensatory damage award. These arguments are unavailing. Simply stated, the Court's conscience is not shocked by the

---

[35] *See e.g. Jones*, 2004 WL 2827924, at *5 (holding that an award of punitive damages almost ten times the compensatory damages does not shock the Court's conscience).

compensatory damage award, and the award is not excessive given the plaintiff's damages. Mr. Galindez sustained a partial amputation of two fingers on his right hand and has undergone three surgeries to date. He has pain in his hand all the time and this pain radiates into his arm whenever he grips an object or raises his hand to shoulder level or above. One of plaintiff's medical experts testified that Mr. Galindez has permanent vascular, bone and nerve damage in his right hand causing persistent pain, and the resultant limitations and restrictions in the use of his hand will be lifelong. The plaintiff, 30 years-old at the time he was injured, has a life expectancy of 42 additional years. Plaintiff's vocational rehabilitation expert opined that he is disabled from his usual occupation as a custom cable installer and plaintiff's economist projected his lost wage claim in excess of $600,000. Defendants offered no witnesses to challenge this testimony. Defendants did not elect to have plaintiff evaluated by an independent medical examiner, nor did they elect to hire a vocational rehabilitation expert or an economist. The plaintiff presented such experts at trial and their expert opinions were unrebutted.

The compensatory damages award suggests that not only did the jury find the testimony of plaintiff's medical, vocational and economic experts credible, but they believed the plaintiff's testimony as well – and with good reason. Mr. Galindez was a very likable witness. From his testimony, the jury could reasonably conclude he is an honest, hardworking, motivated young man and

father. Before the injury, he was healthy, fully active, and had an earning capacity of approximately $60,000 per year, even though he possessed a limited formal education. The plaintiff testified convincingly about his persistent pain and his inability to perform custom cable installation, but did not overstate or in any way exaggerate his injuries.

Based on all the evidence plaintiff presented, a reasonable jury could easily have returned a verdict *in excess* of 3 million dollars. The jury found plaintiff's testimony believable and, as instructed, considered the mental, emotional and physical consequences of his injury. The Court will not disturb the jury's compensatory damages award.

## V. CONCLUSION

The jury verdict stands. The defendants received a fair trial and the Court finds no basis to disturb the jury's decision. The defendants took a risk and PAG, particularly, lost. Given the evidence adduced at trial, the Court cannot and will not rescue the defendants from the consequences of their decision to submit this matter to a jury.

**IT IS SO ORDERED.**

Jan R. Jurden
Judge