IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

| | | |
|---|---|---|
| Miguel Galindez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 04C-05-073-JRJ |
| | ) | |
| Narragansett Housing Associates, L.P., t/a Lexington Green Apartments, Property Advisory Group, Inc. and Locks & Protection Devices, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

Date Submitted: April 5, 2006
Date Decided: November 28, 2006

***OPINION***

*Upon Defendant Narragansett Housing Associates and Property Advisory Group, Inc.'s Motion for a New Trial or Remittitur* - **DENIED**

*Upon Defendant Property Advisory Group, Inc.'s Motion for Judgment as a Matter of Law* - **DENIED**

*Appearances*:

Richard A. Zappa, Esquire, Young Conaway, Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, P.O. Box 391, Wilmington, Delaware, 19899-0391, for plaintiff.

Dawn Courtney Doherty, Esquire, and Megan T. Mantzavinos, Esquire, Marks, O'Neill, O'Brien & Courtney, 913 North Market Street, Suite 800, Wilmington, Delaware, 19801, for defendants Narragansett Housing Associates, L.P., and Property Advisory Group, Inc.

Sean A. Dolan, Marshall, Dennehey, Warner, Coleman & Goggin, 1220 North Market Street, 5th Floor, P.O. Box 8888, Wilmington, Delaware, 19899-8888, formerly counsel for defendants Narraganset Housing Associates, L.P. and Property Advisory Group, Inc.

Charles P. Coates, III, Esquire, Law Offices of Charles P. Coates, III, 131 Continental Drive, Suite 407, Newark, DE 19713, for defendant Locks and Protection Devices, Inc.

JURDEN, J.

This is the Court's decision on Defendants Narragansett Housing Associates, L.P., and Property Advisory Group, Inc.'s Motion for New Trial or Remittitur and Defendant Property Advisory Group, Inc.'s Motion for Judgment as a Matter of Law following a $13 million jury verdict on March 23, 2006.[1]

## I. FACTS

The plaintiff, Miguel Galindez, was injured on November 13, 2003 at the Lexington Green Apartment Complex, which is owned by defendant Narragansett Housing Associates, L.P. ("Narragansett"), and managed by Property Advisory Group, Inc. ("PAG").[2] (Hereinafter collectively referred to as "defendants.") Plaintiff was injured when a door with a broken closer in an interior hallway of the Brandywine Building, one of the apartment buildings in the Lexington Green Apartment Complex, slammed shut and crushed part of his right hand.[3] The plaintiff, a cable installer, sustained permanent damage to the hand, including the amputation of the upper phalange of one finger, and the vascular destruction of the upper phalange of another finger.[4]

## II. PROCEDURAL HISTORY

A four day jury trial resulted in a verdict in favor of the plaintiff for $3,000,000 in compensatory damages against the defendants Narragansett and

[1] The jury awarded $3 million in compensatory damages against defendants Narragansett Housing Associates, L.P. t/a Lexington Green Apartments and Property Advisory Group, Inc. and $10 million in punitive damages against Property Advisory Group, Inc. only.
[2] Am. Cmpl., D.I. 37.
[3] *Id.*, ¶¶ 9-13.
[4] *Id.*, ¶ 18.

PAG, and $10,000,000 in punitive damages against defendant PAG. The jury found Locks and Protections Devices, Inc. not liable.

At the conclusion of the evidence, PAG moved for judgment as a matter of law on Mr. Galindez' reckless conduct/punitive damages claim against PAG. The Court denied the motion and submitted the claim to the jury. Following the verdict, defendant PAG renewed its motion for judgment as a matter of law pursuant to Superior Court Civil Rule 50(b) and defendants Narragansett and PAG filed a motion for a new trial or remittitur of the damages awarded by the jury.

## III. STANDARD

### A. Motion for New Trial/Remittitur

The standard of review on a motion for new trial is well-settled. The jury's verdict is presumed to be correct. Barring exceptional circumstances, the Court should not set aside a jury's verdict unless it contradicts the great weight of the evidence, or the Court is convinced the jury disregarded the applicable rules of law. The Court will order a new trial only if it determines the jury's verdict was tainted by legal error committed by the Court before or during trial.[5] When considering a motion for new trial under Superior Court Civil Rule 59, the Court is mindful that "[t]raditionally, the court's power to grant a new trial has been

[5] *See Kelly v. McHaddon*, 2002 WL 388120, at *4 (Del. Super.).

exercised cautiously and with extreme deference to the findings of the jury."[6] If the case involves a controverted issue of fact on which the evidence is conflicting, and "out of the conflict may be gathered sufficient evidence to support a verdict for either party, the issue of fact will be left…to the jury."[7] Thus, the Court will not disturb a jury's verdict unless "the evidence preponderates so heavily against the jury verdict that a reasonable jury could not have reached the result."[8] In considering a new trial motion, the Court cannot ignore the legitimate role of the jury.[9] With respect to remittitur, the Court will not reduce a jury award unless it is "so grossly excessive as to shock the Court's conscience and sense of justice; and the injustice of allowing the verdict to stand is clear."[10]

## B. Motion for Judgment as a Matter of Law

Judgment as a matter of law is granted when there is no legally sufficient evidentiary basis for a reasonable jury to find for a party on a claim or issue.[11] When reviewing such a motion during or after trial, the trial judge is required to view all facts in the light most favorable to the non-moving party and deny the

---

[6] *Maier v. Santucci*, 697 A.2d 747, 749 (Del. 1997) (*citing Lacey v. Beck*, 161 A.2d 579 (Del. Super. 1960)).
[7] *Storey v. Camper*, 401 A.2d 458, 462 (Del. 1979) (*quoting Philadelphia, B. & W. R. Co. v. Gatta*, 85 A. 721, 729-30 (Del. 1913)).
[8] *Id.* at 465 (*citing Philadelphia, B. & W. R. Co.*, 85 A. 721). *See also Lopez v. McWhorter*, 1995 WL 264610, at *1 (Del. Super.) (*quoting Ellis v. Shipe*, 1995 WL 158691, at *1 (Del. Super.)) ("While the trial judge in Delaware is permitted to undertake a review of all the evidence, he must be cautious of exercising 'an over-active judicial reach.'").
[9] *Stabler v. Smith*, 1996 WL 944863, at *1 (Del. Super.).
[10] *Riegel v. Aastad*, 272 A.2d 715, 717-18 (Del. 1970)(*citing Bennett v. Barber*, 79 A.2d 363 (Del. 1951); *Lacey*, 161 A.2d 579).
[11] Super. Ct. Civ. R. 50(a).

motion if, under any reasonable view of the evidence, the jury could find in favor of the non-moving party.[12]

Under Delaware law, "reckless" and "wanton" are essentially synonymous terms. The Delaware Superior Court Pattern Civil Jury Instructions for reckless conduct and wanton conduct are, for all intents and purposes, identical.[13] Recklessness does not require a showing of an intent to cause harm or malice, but does require a showing of conduct that is "so unreasonable and so dangerous that the person either knows or should know that harm will probably result."[14] If the facts of the case establish a reasonable inference that the defendant's conduct was reckless, the trial Court is required to submit that issue to the jury for resolution, and a post-trial motion for judgment as a matter of law under Rule 50(b) must fail if such is the case.[15]

## IV. DISCUSSION

### A. Motion for New Trial or Remittitur

Under Delaware law, a jury's verdict is presumed to be correct and just.[16] A jury award that is challenged as excessive will not be disturbed unless it is clearly

[12] *Ebersole v. Lowengrub*, 208 A.2d 495, 497-98 (Del. 1965).
[13] *See* Del. P.J.I. Civ. §§ 5.9 and 5.10 (2000).
[14] Del. P.J.I. Civ. § 5.9 (2000) (*citing* 11 *Del. C.* § 231(c); *Hamilton v. State*, 816 A.2d 770, 773-74 (Del. 2003); *Tackett v. State Farm Fire and Cas. Ins. Co.*, 653 A.2d 254, 265-66 (Del. 1995); *Jardel Co. v. Hughes*, 523 A.2d 518, 529-30 (Del. 1987)).
[15] *See e.g., Moore v. SOM, Inc.*, 2005 Del. Super. LEXIS 100, at *1-2; *Jones v. Delaware Cmty. Corp. for Individual Dignity*, 2004 Del. Super. LEXIS 133, at *11-12; *Christiana Marine Service Corp. v. Texaco, Inc.*, 2004 Del. Super. LEXIS 3, at *8.
[16] *Storey v. Castner*, 314 A.2d 187, 193 (Del. 1973) (*citing Lacey*, 161 A.2d 579).

the "result of passion, prejudice, partiality, or corruption; or that it was manifestly the result of disregard of the evidence or applicable rules of law."[17] Moreover, a jury award will not be set aside "unless it is so grossly excessive as to shock the Court's conscience and sense of justice; and unless the injustice of allowing the verdict to stand is clear."[18] When any "margin for reasonable difference of opinion exists in the matter of a verdict," the courts will yield to the jury's decision.[19] A jury verdict that is supported by the evidence must be upheld.[20]

Notwithstanding the deluge of new trial motions the Court has considered in the last several years,[21] the Court seldom interferes with a jury verdict.[22] As this

---

[17] *Medical Center of Delaware, Inc. v. Lougheed*, 661 A.2d 1055, 1061 (Del. 1995) (*quoting Riegel*, 272 A.2d at 717-18).

[18] *Castner*, 314 A.2d at 193 (*citing Riegel*, 272 A.2d at 718; *Bennett*, 79 A.2d 363).

[19] *Id.* (*citing Burns v. Delaware Coca-Cola Bottling Company*, 224 A.2d 255, 258 (Del.Super. 1966)).

[20] *Lougheed*, 661 A.2d at 1061 (*citing Gannett Co. v. Re*, 496 A.2d 553 (Del. 1985)).

[21] *See e.g. Beatty v. Smedly*, 2003 WL 23353491, at *3 (Del. Super.) ("[M]otions for new trials have become the norm after parties to personal injury litigation are on the receiving end of jury verdicts which do not meet their expectations."); *Dunkle v. Prettyman*, 2002 WL 833375, at *3 n.10 (Del. Super.) ("Remarkably, this judge has seen a motion for new trial following every jury verdict he has taken over the last 17 months which resolved claims for personal injuries involving disputed damages."); *Hartnett v. Romspert*, 1995 WL 945818, at *1 (Del. Super.) ("This Court is bombarded by post-trial motions by disappointed plaintiffs...what is frustrating is the continuing anticipation that somehow the Court can automatically make real the plaintiffs expectation after a jury has decided to the contrary."); *Esry v. St. Francis Hospital, Inc.*, 2002 WL 558878, at * 1 (Del. Super.) ("One must wonder why an institution so soundly *and regularly* criticized on motions for new trial is so widely demanded upon initiation of a lawsuit.") (emphasis added).

[22] *Stabler*, 1996 WL 944863, at *1. *See also Savage v. Cooke*, 1995 WL 945563 (Del. Super.). In *Dunkle*, 2002 WL 833375, at *2-3 (citations omitted), the Court noted:

> [W]hen considering a motion for new trial, this Court is ever-mindful of the substantial effort that is expended to accommodate a litigant's demand for a trial by jury. First and foremost, fourteen citizens of this state are asked to interrupt their lives to consider evidence and resolve a dispute that has nothing to do with them. Then, court personnel are assigned to orient, accommodate, feed, escort and protect the jury. And finally, the Court and counsel exert substantial energy to create a set of suitable voir dire questions at the outset of the trial, and suitable jury instructions at the close of the trial. While certainly not dispositive of the issue, the strict standard of review by which a motion for new trial is measured no doubt recognizes that it is the parties themselves who elect to present their claims to a jury of their peers and, by so doing, it is the parties who activate the machinery which is our jury trial system. When the parties activate the jury trial system, they activate the risk inherent in the system. And, of course, trials by jury implicate the most risky element of dispute resolution – uncertainty.

Court has aptly noted on many occasions, and as counsel are painfully aware, litigation is risky business. Jury trials are even more risky.[23] Regrettably, for litigants, the Court cannot make either risk free.[24] When parties elect a jury trial, "they [knowingly] activate the risk inherent in the system."[25] That is the nature of the beast.

Defendants argue that the Court should grant a new trial or a substantial remittitur in this case because: (1) the vacating of the jury's punitive damages award requires a general new trial on all issues of liability and compensatory damages; (2) the jury's compensatory damages award was excessive, or (3) the jury's punitive damages was excessive.[26]

The Court will address defendants' punitive damages argument first. Defendants claim that the Court erred by allowing the jury to consider the issue of punitive damages, and that once this issue incorrectly went to the jury, the jury was improperly prejudiced by it. In other words, according to defendants, the evidence relevant to punitives tainted the jury and impermissibly colored their view of the evidence relevant to compensatory damages. Defendants argue that "[h]ow this accident happened and the nature and cause of the plaintiff's injury were unique

---

[23] *See Dunkle*, 2002 WL 833375, at *3 ("And, of course, trials by jury implicate the most risky element of dispute resolution – uncertainty.").
[24] *See Savage*, 1995 WL 945563, at *1 ("Trials involve risk and those of involved in the judicial system cannot make litigation risk-free."); *Ellis*, 1995 WL 158691, at * 3 n.1 ("Trials involve risk...People within the system can only do so much; they cannot make litigation risk-free.") *See also Stabler*, 1996 WL 944863.
[25] *See Dunkle*, 2002 WL 833375, at *3 ("And, of course, trials by jury implicate the most risky element of dispute resolution – uncertainty.").
[26] Def. Opening Br., D.I. 62, at 1.

and completely unprecedented..."[27] Consequently, defendants claim they had no actual or constructive notice that injury of this type would occur if the door closer at issue was not repaired. Relying on *Jardel*,[28] defendants point out:

> Where the claim of recklessness is based on an error of judgment, a form of passive negligence, the plaintiff's burden is substantial. It must be shown that the precise harm which eventuated must have been reasonably apparent but consciously ignored in the formulation of the judgment.[29]

Defendants maintain that plaintiff did not discharge this substantial burden.

Plaintiff counters by pointing out, *inter alia*, that (1) PAG knew from a survey[30] performed almost three weeks before plaintiff was injured, that the closer on the second floor rear door of the Brandywine building was not operating properly; (2) PAG had a legal and contractual duty to repair door closers that were not operating properly and to institute a preventive maintenance plan; and (3) although PAG was aware that applicable industry standards required that the broken door closer be repaired (or replaced) within 48 hours, it decided not to hire a third party contractor or have its in-house maintenance staff make the repair. Plaintiff also points out "[t]he jury could reasonably conclude from the evidence that...[PAG's] conduct was particularly reprehensible because it tried to cover up

---

[27] Def. Opening Br., D.I. 62, at 5.
[28] *Jardel*, 523 A.2d 518.
[29] *Id.* at 531.
[30] This survey (hereinafter referred to as the "Campbell Survey"), dated October 27, 2003, was prepared by Eric Campbell, owner of defendant Locks and Protection Devices, Inc.

its misconduct...."[31] Plaintiff alleges PAG attempted to "cover up its misconduct" by: (1) claiming that Eric Campbell (of defendant Locks and Protection Devices, Inc.) installed the closer on the door which injured Mr. Galindez even though PAG could produce no specific documentation to substantiate the claim, Mr. Campbell expressly denied it, and an eyewitness (June Hollis) offered sworn testimony that the closer was broken on the day of the accident and for at least a year prior to Mr. Galindez' injury; (2) replacing the door closer on November 13, 2003 immediately after the accident to make it look like it was the closer installed by Eric Campbell that was not working properly when Mr. Galindez was injured; and (3) removing and disposing of the closer after plaintiff's claims were filed in Court so that the door closer could not be inspected and tested by plaintiff's liability expert or linked to PAG. In addition to the Campbell Survey, plaintiff cites to much other trial testimony and numerous exhibits in support of its reckless conduct claim. Just some examples are: (1) Eric Campbell's letters to Greg Jenner ("Jenner") dated October 29 and November 6, 2003, proving that PAG knew about the dangerous conditions described in the Campbell Survey as early as April of 2003, approximately seven months prior to Mr. Galindez' injury; (2) testimony from Julius Pereira and James Baird proving that the problem of broken door closers in the common area hallways at Lexington Green Apartments, as described in the

[31] Pl. Br. Opp'n, D.I. 67, at 9.

Campbell Survey, continued without any significant remediation up until the time of trial; (3) damaging testimony from Susanne Rimel ("Rimel"), discussed below, establishing the knowing breach of PAG's duty and the foreseeability of the manner and nature of plaintiff's injury and (4) testimony from June Hollis ("Hollis") that the door which injured Mr. Galindez was broken and left unrepaired for about one year prior to the accident even though she and other tenants had banded together with the help of a Community Legal Aid Lawyer and demanded that it be repaired; (5) testimony from Jenner about PAG's operations in Delaware and other states and about PAG's management responsibilities under its property management contract for Lexington Green Apartments; (6) testimony from Jenner and Rimel that the problems with the door and door closers, as described in the Campbell Survey, were never repaired by the on-site maintenance staff or by any outside contractors; and (7) testimony from Rimel that the Lexington Green and Liberty Terrace apartment complexes, which PAG wanted to purchase, produced 2.3 million dollars in annual rental revenues, mostly guaranteed by the federal government.

The Court remembers this trial well. One of the reasons the trial is so memorable is the testimony of Susan Rimel, the community manager of Lexington Green Apartments and an employee of PAG. On direct examination, when asked

about how maintenance issues are handled at the Lexington Green apartment complex, replied:

> If somebody called and told us the closer was completely broke off and the door was slamming, I would send somebody over there, but if they called and say it's hanging open – the biggest problem in the hallways of Lexington Green is vandalism. They are always breaking the closers off because they don't want the doors shut, "they" being the people hanging in the hallways that are independent pharmacists, I guess is the word. They like to sell their own brands, and children doing vandalism, they're always breaking the door closers, the glass. We changed from glass to plexiglass because there was so much of the glass broken out of the doors, and the handles, and that's because they tied the door open so that – and that's one of the reasons Arbor Management entered into a contract with Eric Campbell to secure the doors.
>
> Those – those slide plates were broke within three months of being put on. None of them worked. The residents broke them. They don't want them there, because when the police are chasing them, they go straight through the buildings, and that's why we then called Eric back to say, "Eric, okay, these didn't work. Can you get us key locks. We need to get these door locked," and Mr. Campbell come out.[32]

Not only did Rimel admit that she did not hire anyone or order maintenance to fix the broken door closer identified in the Campbell Survey, she admitted that she knew (before the plaintiff was injured) a door without a properly functioning closer is an unsafe condition that could cause an injury like the one suffered by

[32] Trial Tr. Rimel, D.I. 71, at 180-181.

plaintiff.[33] Unfortunately, the transcript does not (and cannot) capture Rimel's tone and demeanor while delivering her diatribe. But the Court remembers this particular testimony and its impact vividly. The "they" Rimel was referring to, with palpable disgust and indifference, the residents of the Lexington Green apartment complex (300 of them children), were portrayed through Rimel's tone, demeanor, and words as hoodlums, vandals, drug dealers, and fugitives. It was clear after Rimel testified that PAG did not fix the broken door because "*they*" would just break it again, and that PAG considered it a waste of its time and money to fix a door "these people" would just break again when running away from the police.[34] The moment Rimel dropped this bomb in the courtroom, the defense was doomed. To say Rimel's testimony was harmful to the defense is an understatement. Overall, she conveyed a callous and indifferent attitude toward the safety of the residents and others on the premises, engaged in stereotyping which could have been interpreted as racism, showed zero understanding or compassion for economically disadvantaged or disenfranchised people and children, and suggested that it would be a waste of time and money to fix dangerous conditions because the vandals who created those conditions would just do so again. Rimel's testimony was the proverbial "icing on the cake." With this,

[33] Trial Tr. Rimel, D.I. 71, at 183-184.
[34] *Id.* at 180-181.

plaintiff discharged his burden with regard to his reckless conduct claim, and then some.

In light of all the evidence, plaintiff was entitled to a punitive damage instruction and the Court gave it. As the Court expected, based on the evidence, the jury assessed punitives against PAG. The jury concluded that a large punitive damages award was warranted and reasonable given the financial condition of PAG, and was necessary in order to deter PAG from engaging in the same or similar conduct at Lexington Green Apartments. Given the evidence, the Court will not vitiate this punitive damage award, nor will it reduce it. The ratio of punitive damages to compensatory damages is 3.3. In light of all the evidence, the Court's conscience is not shocked by this ratio or the amount of the punitive damages award.[35]

In support of their argument that the three million dollar compensatory damages award is excessive, defendants point out that: plaintiff sustained injury to only two fingers; his last medical treatment for that injury occurred well over a year before trial; he did not assert a claim for future medical expenses; he was still able to work as a standard cable installer; and his special damages totaled less than 17% of the jury's total compensatory damage award. These arguments are unavailing. Simply stated, the Court's conscience is not shocked by the

[35] *See e.g. Jones*, 2004 WL 2827924, at *5 (holding that an award of punitive damages almost ten times the compensatory damages does not shock the Court's conscience).

compensatory damage award, and the award is not excessive given the plaintiff's damages. Mr. Galindez sustained a partial amputation of two fingers on his right hand and has undergone three surgeries to date. He has pain in his hand all the time and this pain radiates into his arm whenever he grips an object or raises his hand to shoulder level or above. One of plaintiff's medical experts testified that Mr. Galindez has permanent vascular, bone and nerve damage in his right hand causing persistent pain, and the resultant limitations and restrictions in the use of his hand will be lifelong. The plaintiff, 30 years-old at the time he was injured, has a life expectancy of 42 additional years. Plaintiff's vocational rehabilitation expert opined that he is disabled from his usual occupation as a custom cable installer and plaintiff's economist projected his lost wage claim in excess of $600,000. Defendants offered no witnesses to challenge this testimony. Defendants did not elect to have plaintiff evaluated by an independent medical examiner, nor did they elect to hire a vocational rehabilitation expert or an economist. The plaintiff presented such experts at trial and their expert opinions were unrebutted.

The compensatory damages award suggests that not only did the jury find the testimony of plaintiff's medical, vocational and economic experts credible, but they believed the plaintiff's testimony as well – and with good reason. Mr. Galindez was a very likable witness. From his testimony, the jury could reasonably conclude he is an honest, hardworking, motivated young man and

father. Before the injury, he was healthy, fully active, and had an earning capacity of approximately $60,000 per year, even though he possessed a limited formal education. The plaintiff testified convincingly about his persistent pain and his inability to perform custom cable installation, but did not overstate or in any way exaggerate his injuries.

Based on all the evidence plaintiff presented, a reasonable jury could easily have returned a verdict *in excess* of 3 million dollars. The jury found plaintiff's testimony believable and, as instructed, considered the mental, emotional and physical consequences of his injury. The Court will not disturb the jury's compensatory damages award.

## V. CONCLUSION

The jury verdict stands. The defendants received a fair trial and the Court finds no basis to disturb the jury's decision. The defendants took a risk and PAG, particularly, lost. Given the evidence adduced at trial, the Court cannot and will not rescue the defendants from the consequences of their decision to submit this matter to a jury.

**IT IS SO ORDERED.**

Jan R. Jurden
Judge